Olimpio Lee Squitieri
SQUITIERI & FEARON, LLP
2600 Kennedy Boulevard
Suite 1K
Jersey City, New Jersey 07306
Tel: (201) 200-0900
Fax: (201) 200-9008

- and -

32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

Attorneys for Plaintiff, Cobalis Corp., a Nevada Corporation

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **COBALIS CORP.**, a Nevada corporation, | Civil Action No.: |
| Plaintiff, | |
| | **COMPLAINT** |
| vs. | |
| **YA GLOBAL INVESTMENTS, L.P.**, a Delaware limited partnership, formerly known as **CORNELL CAPITAL PARTNERS, LP**; and **YORKVILLE ADVISORS, LLC**, a Delaware limited liability company, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, COBALIS CORP., a Nevada corporation, ("Cobalis") hereby respectfully complains and alleges as follows based upon its own knowledge and information:

## I.
## STATEMENT OF JURISDICTION AND VENUE

1. Plaintiff Cobalis brings this action on its own behalf. Cobalis Corp. is a Nevada corporation with its principle place of business in California. None of the Defendants is a citizen or resident of California. The Defendants are organized and existing under the laws of the State of Delaware and maintain their principle place of business in Jersey City, New Jersey. The amount in controversy exceeds $75,000, exclusive interest and costs. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332 and venue lies here because all defendants transact business in this vicinage.

2. This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have. The Defendants are subject to personal jurisdiction in this district.

## II.
## PARTIES

3. Plaintiff, Cobalis Corp., ("Cobalis") is corporation duly formed and organized under the laws of the State of Nevada and qualified to transact business in the State of California where it maintains its principal place of business.

4. Defendant, YA Global Investments, L.P. ("YAGI") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal office in Jersey City, New Jersey. YAGI is the successor in interest to Cornell Capital Partners, LP ("Cornell").

5. Defendant, Yorkville Advisors, LLC ("Yorkville"), is a limited liability company with its principal place of business in Jersey City, New Jersey and is a consultancy that arranges fro financings for public companies using a technique known as Private Investment in Public Equities ("PIPE") which are placed with co-defendant YAGI.

## III.

## SUBSTANTIVE ALLEGATIONS

6.      Plaintiff is a specialty pharmaceutical company that has been focused on the development of PreHistin®, a patented, over-the-counter dietary supplement product intended to treat seasonal and year-round allergy sufferers. Plaintiff intends to market its product over-the-counter in major drugstore chains and other outlets worldwide. PreHistin® is intended to become the first medication aimed specifically at rectifying imbalances in the immune system that trigger the over-production of allergy symptom-causing substances, including histamine. By preventing or reducing the over-production of histamine before it is released, Cobalis believes PreHistin® represents a novel and compelling alternative to the standard "antihistamine" approach to treating allergic disease.

7.      In late 2006, while PreHistin® was still undergoing Phase III trials, Cobalis recognized a need for financing to continue the testing and subsequently to commence marketing, manufacturing, sales and distribution of its product. Regardless of PreHistin's FDA approvability, the product could and would be marketed and distributed commercially either as a dietary supplement for which no FDA approval is required.

8.      YAGI, formerly known as Cornell, holds itself out to the public as an investment consulting firm and is one of the more active hedge funds in PIPE transactions that arranges financing for public companies using a technique known as Private Investment in Public Equities ("PIPE"). YAGI is one of the largest (if not the largest) participants in PIPE transactions and has entered into over 350 transactions with publicly traded companies since 2001. PIPE transactions are authorized under Rule 152 under the Securities Act of 1933, as amended, which provides a safe harbor to the issuer, a publicly traded company, completing a private placement offering and

3

subsequently registering the securities for resale to the public. A traditional PIPE is a purchase of stock in a company at a discount to the current market value per share for the purpose of raising capital. In a traditional PIPE, the stock is issued by a publicly traded company at a set price to raise capital for the issuer. In a "structured" PIPE, the first step is private placement of debt securities or debentures that are convertible into common stock at a conversion price that automatically adjusts downward if the company's share price falls. These structured PIPEs have been colloquially dubbed "toxic" or "death-spiral" convertibles because the purchaser of PIPE convertible debentures has a strong incentive for short selling to lock in the sale price of the company's stock. The short position may be covered by converting shares in the debentures. This selling creates downward pressure on the issuer's stock, which benefits the debenture holder by allowing it to obtain more shares through conversion shares at depressed prices. Indeed, there is no limit on the downward adjustment of the conversion price. The prospect of large-scale conversions and sales at declining prices can create selling pressure which pushes the issuer's share price downward. Structured PIPE debenture purchasers are ambivalent towards the performance of the company because they can reap substantial gains as the stock spirals downward. Hedge funds are able to obtain market-beating returns notwithstanding the poor performance of PIPE issuers through a relatively straightforward trading strategy. They sell short the issuer's common stock promptly after the PIPE deal is publicly disclosed. To execute a short sale, a fund borrows stock of the PIPE issuer from a broker–dealer and sells this borrowed stock into the market. The fund then closes out or covers the short sale at a later date by buying shares in the open market and delivering them to the lender. By shorting stock against the PIPE shares, the fund locks in the PIPE deal purchase discount.

9. From 2001 through 2008, YAGI invested in 358 deals/transactions using PIPEs. The numbers are staggering. Over that period of time, YAGI either invested or made commitments of $4.353 billion which resulted in the following: (i) more than 75% (271 out of 358) are either bankrupt, not trading, worthless, or trading at less than $0.01 per share; (ii) more than 96% (344 out of 358) have a lower stock price since YAGI's date of investment; (iii) 90% do not have a stock price that is in excess of $0.10 (only 36 out of 358 have a stock price of at least $.010 per share); and (iv) only 10% (37 out of 358) have a stock price more than $0.01 per share but more than $0.10 per share.

10. In and about late 2006, Plaintiff and Defendants discussed financing alternatives for Plaintiff. At the time, Plaintiff was an exchange listed, SEC-registered company. Upon information and belief, Yorkville was not registered with the SEC in 2006, 2007 and 2008 as an investment adviser.

11. On or about December 20, 2006, Plaintiff entered into a structured PIPE transaction with Defendants, pursuant to which Plaintiff agreed to issue Cornell secured convertible debentures in a private placement offering, followed by a registration of the common stock. Cornell could convert its debentures based on a 10% discount from the 3 lowest volume-weighted average share price (VWAP) over a 15 day look-back period of time preceding the conversion. Counsel selected by Cornell prepared the various agreements comprising the structured PIPE transaction. The documents comprising the PIPE Transaction are listed below:

- SECURITIES PURCHASE AGREEMENT
- SECURED CONVERTIBLE DEBENTURE
- REGISTRATION RIGHTS AGREEMENT
- SECURITY AGREEMENT
- ASSET PLEDGE STATEMENT
- PLEDGE AND ESCROW AGREEMENT
- IRREVOCABLE TRANSFER AGENT INST.
- LOCK UP AGREEMENT

- o WARRANT NO. CLSC-1-A
- o WARRANT NO. CLSC-1-B
- o WARRANT NO. CLSC-1-C
- o WARRANT NO. CLSC-1-D

and are incorporated by reference herein ("Instruments").

12. The substance of the entire transaction was a loan of funds from Defendants to Plaintiff. The entire transaction was complex and gave rise to a number of relationships between Plaintiff and Defendants, including but not limited to borrower-lender.

13. Pursuant to the terms of the Instruments, Yorkville received a fee based on 10% of the transaction value of the Transaction Documents plus some other legal fees amounting to total fees of $415,000 in fees to Yorkville.

14. The Debentures were convertible into shares of Plaintiff's common stock determined by dividing the dollar amount being converted by the lower of the fixed conversion price of $0.99 or the market conversion price, defined as 90% of the average of the lowest three daily volume weighted average trading prices per share of the Company's common stock for the fifteen trading days immediately preceding the conversion date. Cobalis, under the terms of the Debentures, had the right, *at any time* after the initial registration of YAGI's free-trading shares in or about April 2007, to redeem same, partially or entirely, by tendering funds to YAGI plus a premium depending on the price of Cobalis' stock at the time of payment.

15. The convertible Debentures were to be secured by the assets of the Company pursuant to the terms of the Security Agreement. The Security Agreement and other transaction documents required Cornell to perfect its security interest through a UCC-1 filing and for Plaintiff to lend its cooperation, if necessary.

16. The convertible debentures were further secured and guaranteed by an Asset Pledge Agreement by 8,400,000 shares of the Radovich family common stock with recourse.

6

The Radovich family shares so pledged and the Radovich family's obligation thereunder constitute "personal guarantees" under applicable law. The appointed escrow agent is David Gonzalez, Esq., who is also YAGI's chief legal counsel.

17. In order to insure: (1) Cornell would be able to promptly take delivery of share certificates after a notice of conversion; and (2) Plaintiff would have sufficient quantities of shares available to issue to Cornell after a notice of conversion, and collectively so as to eliminate any risk to Cornell that Plaintiff or its transfer agent would delay delivery, Plaintiff agreed to grant Cornell the right to control issuance and delivery of all shares convertible under the securities purchase agreement, debentures, and warrants. This right of control was set forth in the Pledge and Escrow Agreement, pursuant to which Plaintiff was required to reserve 10,583,000 shares of common stock, later increased to 15,400,000 shares, and granted control over such shares to David Gonzalez, Esq., Cornell's attorney, as the appointed escrow agent. Cornell's control over issuance and delivery of the shares was solidified by Irrevocable Instructions to the stock transfer agent executed by Plaintiff by which Cornell was granted the right to compel the stock transfer agent to issue share certificates to Cornell after receipt of a Notice of Exercise of Conversion.

18. Ultimately, Defendants loaned to Plaintiff a total of $3,850,000. Under the terms of the Instruments, the potential payments to Defendants, not including principal repayments, could total $2,840,500 or approximately 77% of the borrowings. Moreover, <u>excluding</u> redemption premiums, and "liquidated damages" amounts (which are disguised financing fees), the commitment fees, structuring fees and interest payments were stated at $1,021,000.00 or approximately 27% of the borrowing. Finally, the upfront commitment fees ($385,000.00) and structuring fees ($30,000.00) total $415,000.00, constituting over 10% of the borrowing. Those

fees constitute interest under California law or New Jersey law which exceed California's Usury list of 10% even before considering the 8% stated intent rate.

19.     These fees referred to above are considered interest under applicable law. In order to collect a 10% fee on the closing of a transaction for the sale of securities, the entity receiving the commission or percentage payment must be a licensed broker dealer, or being providing advisory services. Furthermore, each banker received a fee in relation to the fee generated by YAGI. When commissions are paid to bankers, a registration with the SEC is required as they are being compensated for raising money. YAGI, again violated US Securities laws by failing to register with the SEC. As YAGI or Yorkville were not licensed broker/dealers or in any way licensed by the SEC, this fee, must be deemed an advisory fee, which must be counted as interest under either New Jersey or California law. Upon information and belief, in 2006 none of the employees of YA who were responsible for the delivery of professional services to Cobalis were, licensed by any governmental or financial industry regulatory authority to provide financial services in the States of California and/or New Jersey.

20.     YAGI converted the Debentures in April through July of 2007 in which the average monthly volume of number of Cobalis shares traded increased by 4 to 10 times the average of the prior three months' trading volume. The conversions reduced the outstanding debt but did not reduce the fees thus effectively increasing the interest rate on borrowings.

21.     Upon information and belief, after the Instruments were executed but before YAGI received its free-trading registered shares in April thru July 2007, YAGI and/or its agents or affiliates sold and/or short sold shares of Cobalis' stock.

22.     Plaintiff is informed and believes and based thereon alleges that Defendants, including their respective affiliates or brokers acting on behalf of defendants or at their instance

and request, accumulated the following shares of Plaintiff's common stock through conversions, with such accumulation being primarily for purposes of covering short sales of Plaintiff's such shares of common stock made in advance of receipt of certificate from conversion.

23.     Plaintiff's stock price at the end of each of the following months, with the total monthly trading volume during said month in set out hereinbelow:

| Month | Close | Trading Volume |
| --- | --- | --- |
| December 2006 | $0.71 | 407,400 |
| January 2007 | 0.74 | 565,100 |
| February 2007 | 1.02 | 1,235,900 |
| March 2007 | 0.80 | 924,000 |
| April 2007 | 1.18 | 3,382,900 |
| May 2007 | 0.72 | 3,712,700 |
| June 2007 | 0.35 | 2,147,600 |
| July 2007 | 0.16 | 8,919,800 |

As demonstrated by the above table, prior to the PIPE transaction with Defendants, Plaintiff's share price ranged between approximately $0.70 -- $1.10, and trading volume was approximately 100,000 to 125,000 shares each week. After the structured PIPE transaction with Defendants, when the registered shares became 'free trading' and available to Cornell to convert or cover their short sales, trading volume rapidly increased to approximately 750,000 to 1,000,000 share per week. Because of Cornell's heavily concentrated selling activity in the market – all shares converted or acquired under warrants were sold promptly – there was a constant downward pressure on the stock price which caused the share price to decrease until less than 10¢ a share in late July, 2007, and fall to a penny after Cornell filed an involuntary bankruptcy petition against Plaintiff on August 1, 2007.  The rapid increase in the trading volume and dramatic decrease in share price was mainly due to Cornell's steady and heavy short selling and sales of shares

9

acquired through exercise of the convertible debentures and warrants in the PIPE transaction, in violation of contractual provisions and covenants prohibiting short sales, hedging operations, and accumulation of shares above a threshold of 4.99% of the outstanding stock, (equal to approximately 2,245,000 shares at any point in time), and holding shares with an investment purpose.

24. The selling, upon information and belief, of large blocks of Cobalis shares by YAGI from April through July 2007, at continually lower prices per share, prevented Cobalis from selling its stock to raise funds to redeem the Debentures. Defendants knew that Plaintiff was seeking to raise capital to redeem the debentures but thwarted such efforts with their voluminous and concentrated selling of stock and their refusal to cooperate with Plaintiff in securing financing from interested parties despite Defendants post-closing agreement with Plaintiff.

25. In mid-July 2007, YAGI declared that Cobalis was in default under its Instruments and gave Cobalis 15 day's notice to cure.

26. On or about August 1, 2007, *before* the expiration of the time period to cure the default, YAGI filed the involuntary Chapter 7 Petition against Cobalis in this Court.

### FIRST CLAIM FOR RELIEF
(For Recission Of All Instruments And Return Of
All Principle And Interest Paid Under California Law Of Usury)

27. Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 37 inclusive.

28. Article XV, Section 1(2) of the California Constitution established the Usury law for California based transactions, such as this one. The maximum rate of interest that can be charged under the *California Constitution* is 10% per annum. *Id.*, § 1. (1).

> No person, association, copartnership or **corporation shall by charging any fee,** bonus, commission, discount or other compensation **receive from a borrower more than the interest authorized by this section upon any loan** or forbearance of any money, goods or things in action. [Emphasis added].

*California Constitution*, § 1. (2).

29. Payments of upfront fees such as those described herein in connection with a loan is deemed to be interest.

30. The legislative exemptions that remove the 10% cap are not applicable here due to the personal guarantees. The most common of these is for a commercial loan of more than $300,000. *California Corporation Code* § 25118(b)(1). This exemption, however, is *lost* if the borrower, as here, requires a personal guaranty by an individual:

> (e) **This section does not apply** to:
>
> (1) any evidence of indebtedness issued **or guaranteed (if the guaranty is part of the consideration for the indebtedness) by an individual**, a revocable trust having one or more individuals as trustors, or a partnership in which, at the time of issuance, one or more individuals are general partners. [Emphasis added].

*Id.*, (e)(1).

31. Because YAGI required that Radul and Chaslav Radovich *pledge* their personal shares to guarantee the loan of Cobalis, the usury exemption is *lost* to YAGI. Radul and Chaslav Radovich pledged 8.4 million shares on December 20, 2006. On that date, according to YAHOO Financial, the closing price per share of Cobalis was $0.75. http://finance.yahoo.com/q/hp?s=CLSC.PK&a=11&b=20&c=2006&d=11&e=21&f=2006&g=d.

32. The pledge of the Radovich was "part of the consideration" of the indebted and therefore falls within the exception, under § 25118(e)(1), to the exemption.

33.     It is undisputed that Cobalis paid to YAGI upfront fees of $385,000; $22,500 and $7,500 under the Instruments. These total $415,000. That amount alone, without even considering other fees due under the Instruments implies an interest rate that is in excess of that permitted by Article XV of the California Constitution. Under Cal. Civ. Code § 1915-3, California's *Usury Law*, Cobalis is entitled to treble damages of $1,245,000.

34.     As the Instruments by their very terms of large upfront fees in addition to an 8% rate of interest are a violation of California law reaching constitutional proportions, the Instruments are illegal and void.

> "Contracts that are contrary to express statutes or to the policy of express statues. . . are illegal contracts. [Citation]. Any such illegality voids the entire contract. [Citation]." **235 (*Green v. Mt. Diablo Hospital Dist.*, (1989) 207 Cal.App. 3d 63, 73, 254 Cal.Rptr. 689).

*Mechanical Contractors Assn. v. Greater Bay Area Assn.*, 66 Cal. App. 4th 672, 688 (Cal. App. 1 Dist. 1998).

35.     As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined by the trier of fact.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief & Injunctive Relief)

36.     Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 44, inclusive.

37.     Controversies have arisen concerning the enforceability payments due under the Instruments for reasons of the illegal nature of the Instruments and usurious intend charged on the borrowings.

38.     Plaintiff desires a judicial determination of the rights, duties and obligations of the parties under the Instruments.

39. Plaintiff further requests that such decree apply California law because all parties were operating in California at all relevant times, the transaction was consummated in California, the financing terms of the Instruments implicate matters of public policy under California law and thus under California conflicts of laws and New Jersey conflict of laws California Usury Law will apply.

40. Plaintiff also prays for a preliminary injunction and permanent injunction enjoining and prohibiting Defendants from enforcing any provisions of the Instruments and compelling Defendants to return all principle and interest and other consideration to Plaintiff.

### JURY TRIAL DEMAND

Plaintiff hereby reserves its right to a trial by jury on damages as to claims based on law and not in equity.

WHEREFORE, Plaintiff prays for judgment, as follows:

1. As to Count I for general and compensatory damages and/or restitution or disgorgement in a sum to be determined by the trier of fact;

2. For rescission of contracts sued upon herein and/or recissory damages;

3. For exemplary and/or punitive damages in a sum to be determined by the trier of fact;

4. For a decree consistent with Plaintiff's allegations in Count II of this pleading.

5. For a temporary restraining order, preliminary injunction and permanent injunction as prayed for herein;

6. For reasonable attorneys' fees;

7. For costs of suit herein incurred;

8. For such other and further relief as the court may deem proper.

Dated: August 16, 2011

                              SQUITIERI & FEARON, LLP

                              By: _____
                                  Olimpio Lee Squitieri
                              SQUITIERI & FEARON, LLP
                              2600 Kennedy Boulevard
                              Suite 1K
                              Jersey City, New Jersey 07306
                              Tel: (201) 200-0900
                              Fax: (201) 200-9008

                                        - and -

32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

Attorneys for Plaintiff, Cobalis Corp., a Nevada Corporation